## COMMERCIAL STANDARD INSURANCE COMPANY, Appellant,

### v.

### B. N. SHALLER and Walter Shaller, Appellees.

### No. 6672.

Court of Civil Appeals of Texas.

Amarillo.

April 22, 1957.

Rehearing Denied May 20, 1957.

Underwood, Wilson, Sutton, Heare & Boyce, Amarillo, for appellant.

Gibson, Ochsner, Harlan, Kinney & Morris, Amarillo, for appellees.

NORTHCUTT, Justice.

B. N. Shaller and Walter Shaller sued Commercial Standard Insurance Company upon two insurance policies, one issued in the name of B. N. Shaller and the other issued in the name of Walter Shaller. There is no question but what the policies were in full force until they were picked

up by appellants. The case was tried to a jury upon certain special issues, and upon the verdict of the jury, the court rendered judgment against the insurer and in favor of B. N. Shaller in the sum of $25,000; and Walter Shaller in the sum of $10,000; each recovery bearing interest at the rate of six per cent per annum from the date of the judgment. From this judgment appellant perfected this appeal.

The issues submitted to the jury and their answers thereto were as follows:

"Special Issue No. 6.

"(a) Do you find from a preponderance of the evidence that the authority actually extended to Howard Williams by Commercial Standard Insurance Company did not include the right to write, in the name of Commercial Standard Insurance Company, policies in the amounts in controversy in this suit, being the respective amounts of $25,000.00 and $10,000.00, on properties located and used as were the Hackney Club premises and contents?

"Answer: 'It did include such right', or 'It did not include such right.'

"Answer: It did include such right.

"If you have answered the foregoing subdivision (a) 'It did not include such right'. and in that event only, then answer:

"(b) Do you find from the preponderance of the evidence that at the time said policies were issued the plaintiff, Walter Shaller, had actual notice that Howard Williams did not have authority to issue said policies, if in fact he did not?

"Answer, 'We find he had such notice', or 'We do not so find.'

"Answer: (Not Answered.)

"(c) Do you find from the preponderance of the evidence that at the time said policies were issued the plaintiff,

Mrs. B. N. Shaller, had actual notice that Howard Williams did not have authority to issue said policies, if in fact he did not?

"Answer, 'We find she had such notice', or 'We do not so find.' (Not Answered).

"Special Issue No. 7.

"Do you find from the preponderance of the evidence that the defendant, Commercial Standard Insurance Company, when it received notice in its home office in Ft. Worth, Texas, of the issuance of the policies in question, considered said policies as being in force?

"Answer 'Yes' or 'No.'

"Answer: Yes.

"Special Issue No. 8.

"Do you find from the preponderance of the evidence that Walter Shaller consented to a cancellation of the policies in question before the date of the fire?

"Answer 'Yes' or 'No.'

"Answer: No.

"Special Issue No. 9.

"Do you find from the preponderance of the evidence that Mrs. B. N. Shaller consented to the cancellation of the policy issued to her before the fire in question?

"Answer 'Yes' or 'No.'

"Answer: No.

"Special Issue No. 10.

"Do you find from the preponderance of the evidence that Mrs. B. N. Shaller authorized Walter Shaller to consent to a cancellation of the policy issued to her?

"Answer 'Yes' or 'No.'

"Answer: No.

"Special Issue No. 11.

"Do you find from the preponderance of the evidence that the building and contents decribed in said policies were on or about October 3, 1955, totally destroyed by fire?

"Answer 'Yes' or 'No.'

"Answer: <u>Yes.</u>

"Special Issue No. 12.

"What do you find from the preponderance of the evidence, if any, was the fair market value of the contents of the building destroyed by said fire?

"Answer by stating the amount, if any.

"Answer: $18,000.00.'

There were other issues requested but denied by the court.

Appellant presents this appeal upon twenty points of error; but viewing this record as we see the controlling issues herein, we think points 4, 5 and 6 require the reversal of this case. These three points are as follows:

"Point Four—(Restated)

"The evidence establishes without dispute that Walter Shaller consented to or acquiesced in the cancellation of the policies in question so as to effect as to both policies, and certainly as to his own, an agreed cancellation of the policies in question. For this reason also the policies in question, or at least the policy issued in the name of Walter Shaller, were not in effect at the time of the fire, and the court materially erred in overruling appellant's motions for directed verdict and judgment non obstante veredicto in rendering judgment against appellant.

"Point Five—(Restated)

"The evidence is insufficient to support the jury's finding, made in response to Special Issue Number 8, that

Walter Shaller did not consent to a cancellation of the policies in question before the date of the fire, and so overwhelmingly preponderates against that finding that in the exercise of its proper discretion the court should set the same aside.

"Point Six—(Restated)

"The evidence establishes without dispute that Walter Shaller waived any right he and his mother might have had to require written notice of cancellation, and that he, and through him his mother, is estopped to challenge the manner of cancellation; and for this reason also the court materially erred in overruling appellant's motions for directed verdict and judgment non obstante veredicto and in rendering judgment against appellant."

Mrs. B. N. Shaller never at any time discussed the question of insurance with Howard Williams, the agent representing the appellant. Walter Shaller was the only person ever to discuss the insurance matter with Howard Williams. If the acts of Walter Shaller and Howard Williams in connection with the cancellation of the policies were such as to constitute a cancellation, we think certainly Walter Shaller would be considered the agent of his mother, Mrs. Shaller. Mrs. Shaller testified as follows:

"Q. All right. Fine. In the matter of the issuance of the insurance policies—first, the builders' risk policies, and then the permanent policies, did you ever go to the office of Mr. Williams yourself? A. No, sir.

"Q. Did you ever have any conversation with Mr. Williams on the subject of the issuance of those policies? A. No, sir.

"Q. Then is it true that the negotiations for the issuance of those policies were handled by Walter for you? A. One of them was for me. The others were for himself.

"Q. That is right. But to the extent that the policies were issued for you, was the issuance of those policies handled for you by Walter? A. Yes.

"Q. Was that done by your authority? A. Yes.

"Q. Was that something that you authorized him to do? A. Yes, sir."

See the case of Continental Fire & Casualty Ins. Corporation v. Swanson, Tex.Civ. App., 216 S.W.2d 241, 242 where it is stated: "The agent of the Insurance Corporation dealt only with the Investment Company, and notice to the Investment Company of the cancellation was sufficient." In this case at bar notice was given to Walter Shaller that appellant had picked up the policy and the policy cancelled.

It is admitted that Mr. Williams at all times pertinent to the issuance of the policy in question informed Mr. Shaller that this was the kind of insurance that appellant did not like and he did not know whether the company would stay on the risk or not. The policies were never delivered to appellees but were held by Mr. Williams with the consent of Mr. Shaller because the policies might have to be returned to the company if the company demanded them. The appellees placed Mr. Williams upon the witness stand and the following questions were asked and answered thereto by Mr. Williams:

"Q. Just a minute. I want you to answer my question. Did you ever at any time obtain permission, express permission from Walter, to turn those policies over to the company? A. I will say yes.

"Q. Before you did? A. I will say yes.

"Q. When did you do it? A. In our discussion of the coverage, I told Walter at the time, I say, 'I will hold these policies here, because we do not have a rate yet. They will have to be endorsed. And furthermore, the insurance company, I may have to turn those policies back to the insurance company if they demand it. And that will save me having and your having to dig them up and deliver them back to me.'

"Q. Supposing that is what you told Walter. Did Walter in that conversation tell you, 'Howard, all right, you have my authority to turn them in if the company wants them'? A. Well, he just said, 'Do the best you can about it'.

"Q. He did not give you permission to turn them in? A. Not specifically."

It is admitted by both parties that a policy may be cancelled by mutual agreement though not cancelled in the exact manner provided for in the policy. We think this is correct whether admitted or not. Austin Fire Ins. Co. v. Polemanakos, Tex.Com.App., 207 S.W. 922. Recision of an insurance contract may be accomplished by mutual agreement without an actual surrender of the policy. Whether a recision has been accomplished depends upon the intent of the parties as evidenced by their acts. It is ordinarily a question of fact for the jury to determine whether the parties tendered cancellation or recision and on a motion for a directed verdict the evidence must be viewed in the light most favorable to the parties opposing the motion. The policies in question here were picked up on September 12, 1955, and Mr. Shaller was notified of that fact on the following day. The property was destroyed by fire on October 3, 1955. There is no question under the terms of the policies about appellant having the right to cancel the insurance by giving five days written notice. There is no question in this case about a refund of any premiums as appellees had not paid any. Premiums were charged to Walter and he would be sent a bill for the same on the first of the month. On the builders' risk policy, Walter was billed for the premiums and he paid them, and down to the date of the fire Williams, appellant's agent,

had never had any contact at all with Mrs. Shaller. Walter Shaller was notified on September 13, 1955, by Howard Williams that appellant had picked up the policies in question and had cancelled them. There might have been a different situation involved herein had the fire occurred within the five days from the date appellees were notified of the cancellation since the policies contained the provisions that the company could cancel by giving the five days' notice. It is stated in Frontier-Pontiac, Inc., v. Dubuque Fire & Marine Ins. Co. Tex.Civ.App., 166 S.W.2d 746, 747, as follows: "Under the majority of the decisions, a notice of cancellation effective immediately, or within less time than that provided in the policy, is nevertheless sufficient to cancel the policy at the end of the time limit set out in the policy."

Mr. Shaller testified as follows concerning the matter when he was told the policies had been picked up and cancelled:

"Q. Now then when he told you, the date that he told you that the policies had been picked up, what did you say to him? A. Well, I don't remember, But he says I was out of town the day that he called when Mr. Brown was here. And I presumed that he left word for me to call back because I remember it was a telephone conversation and I was at home.

"I was talking to him on the telephone. And he told me that Mr. Brown had picked up the policies. I believe it was the day before he told me. But at least it was previous to the day that he was talking to me.

"And he told me that they had picked up the policies and had cancelled them. And my reply was, 'Well, where does that leave us.'

"And he came back and he said, 'Well, I guess that just leaves us with the $10,000.00 builder's risk policy.'

"Now that was what was said in that conversation. And I told him that we

had better get a company that would stay on the risk and place the insurance with them.

"Q. And then after that then you yourself also started some inquiry for another company that you could get to stay on the risk? A. That is right. I did some checking on my own."

\* \* \* \* \* \*

"Q. Well, now, Walter, you have been asked by Tom as to what you said to Howard the day he reported to you that the policies had been picked up. Did you tell him that he did not have your permission to deliver the policies? A. No. That was not discussed.

"Q. Then you did not tell him that he did not have your permission to deliver the policies? A. He did not ask.

"Q. But did you tell him? A. There was nothing in the conversation at all about it; so I couldn't tell him if there was nothing in the conversation about it."

\* \* \* \* \* \*

"Q. All right. I will use the Court's language then. Down to the time of the fire, did you make any protest about Howard's action in returning the policies to his special agent? A. Well, I did not tell him that he couldn't do what he had already done, no.

"Q. Did you make any protest of any kind to him down to the time of the fire? A. No, I don't think so.

"Q. Did you lodge any objections down to the time of the fire to what he had done? A. No.

"Q. And when I say, 'Did you lodge any objection', did you lodge any objection either to him or to anyone else for Commercial Standard? A. No.

"Q. Down to the time of the fire did you say either to Howard Williams or to anyone else for Commercial Standard that you questioned his right to re-

turn the policies to his special agent? A. I don't believe I did, no."

\* \* \* \* \* \*

"Q. Now, Walter, from the time that Howard Williams told you that the company had picked up the policies which was some time along in the middle of September; after that you have said that you made some contacts with other agents to write, to get a company who would stay on the risk. And did you find a company who would write a coverage and stay on the risk? A. Yes. I found a company that said they would.

"Q. What was the reason you did not go ahead and close that deal with the company before this fire occurred? A. Well. Howard was working on it. And he had been working on it since sixty days before the permanent coverage was placed. And he had been working on it since the time he notified me that the company had picked up the policies. And I did not feel—I think he would—I don't remember whether he told me—I don't believe he told me at that time that he had found somebody that would take the risk.

"But he had some inquiries out that he thought probably would take the risk. And since he was working on it, I did not want to take the case away from him since he had done so much work on it without checking with him and making sure that he had found some coverage. And in that case I was not going to place it if he had done that."

As stated in the opinion in the case of Austin Fire Ins. Co. v. Polemanakos, Tex. Com.App., 207 S.W. 922, 925, as follows:

"\* \* \* The facts, we think, show that the insured, Polemanakos, consented and agreed to the cancellation of the policy and waived the present repayment of the unearned premium.

The facts are fully set out above, and, without restating them, we think they show that the policies were canceled by agreement. No other reasonable construction, we think, can be given to the words and acts of the insured. The case of Bingham v. Insurance Co., 74 Wis. 498, 43 N.W. 494, and numerous cases cited therein, we think, support our conclusion."

No other reasonable construction, we think, can be given to the words and acts of the parties herein than that these policies were cancelled by agreement of the parties. Judgment of the trial court reversed and judgment rendered that appellees recover nothing as against appellant.